K2LPBOMB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                              19 CR 463 (DLC)

EMILIANO BOMBA,

            Defendant.

------------------------------x

                              New York, N.Y.
                              February 21, 2020
                              9:41 a.m.


Before:

                HON. PAUL A. ENGELMAYER,

                           District Judge


                    APPEARANCES


GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
SEBASTIAN SWETT
    Assistant United States Attorney

TELESFORO DEL VALLE, JR.
    Attorney for Defendant


ALSO PRESENT:  ERIKA de los RIOS, Spanish Interpreter

K2LPBOMB

1          (In open court)

2          (Case called)

3          MR. SWETT:  Good morning, your Honor.  Shebb Swett for

4     the United States.

5          THE COURT:  All right.  Good morning, Mr. Swett.

6          MR. DEL VALLE:  Good morning, your Honor.  Ted

7     Del Valle representing Mr. Emiliano Bomba.

8          THE COURT:  Good morning, Mr. Del Valle, and good

9     morning to you, Mr. Bomba.  Good morning, as well, to the

10    members of the public who are here.

11         I will note for the record that Mr. Bomba is assisted

12    today by a court certified Spanish translator.

13         Mr. Bomba, if at any point you can't hear or

14    understand what the translator is saying, please raise your

15    hand and get my attention because it's imperative that you

16    understand everything that is said.  Will you agree to do that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Very good.  Please be seated.

19         All right.  This case is assigned to my colleague,

20    Judge Cote.  She has referred it to me in my capacity as the

21    Part 1, or emergency, Judge, and so I'm here not for all

22    purposes but solely to resolve the issue that I gather divides

23    the parties today.  Specifically, my understanding from what my

24    deputy has informed me, is that the defense intends to make an

25    application for a condition for release on conditions of bail.

K2LPBOMB

1           In preparation for this proceeding, I have reviewed a

2     very few materials.  I've reviewed the indictment in this case.

3     My deputy has requested, and I have received and reviewed, the

4     brief pretrial services report that was generated in the

5     Central District of California at the time of the defendant's

6     original arrest.  I have reviewed the February 6th addendum

7     prepared by the pretrial services officer here, and I have,

8     just before taking the bench, reviewed the transcript of the

9     February 6th initial pretrial conference held before Judge

10    Cote, at which she set a December trial date and at which the

11    government set out broadly its areas of rule 16 discovery.

12          I've asked Mr. Smallman to reach out to the pretrial

13    services department to make sure that they have an opportunity

14    to be present.  Thus far, they are not, and I need to go ahead

15    with the hearing now.

16          Before I turn to you, Mr. Del Valle, let me just

17    take -- before I turn to you, Mr. Del Valle, let me just turn

18    to Mr. Swett.  Before arguing the issue of bail, can you just

19    give me a little perspective of the case so I have a fuller

20    understanding of it, and then what I propose to do is turn to

21    Mr. Del Valle so he can set out the proposed bail application,

22    and then, Mr. Swett, I'll give you an opportunity to respond.

23          MR. SWETT:  Sure.  So just a little procedural

24    history.  The indictment was returned on June 20, 2019, and

25    charges one count of conspiracy to commit money laundering with

K2LPBOMB

1    five separate objects.

2          The defendant was arrested in the Central District of

3    California on January 13th, 2020.  He initially requested a

4    detention hearing and an identity hearing the following day.

5    There was a bail hearing on January 17th, 2020.  He was

6    detained at that point on the basis of risk of non-appearance.

7          THE COURT:  May I ask you, I take it there's no

8    transcript available of that hearing?

9          MR. SWETT:  I do not have a transcript of that

10   hearing, your Honor.  My understanding, though, is that the

11   sureties that were proposed for his bail package really had no

12   personal relationship with him, and that was, more or less, the

13   basis of the Court's decision.

14         THE COURT:  In other words, was the Court putting in

15   place conceptually the structure of a bail hearing and simply

16   finding that the proposed sureties inadequate, or was the Court

17   doing something other than that?

18         MR. SWETT:  What I have, your Honor, I'm sorry, I

19   didn't print a copy for today, I have a form in which the Court

20   made notations.  And the only one I remember is sort of that

21   the sureties didn't have a relationship.  I don't know if there

22   was -- if the court said anything about whether there could be

23   a package or if there were different sureties.

24         THE COURT:  Right, but sometimes what a Court will say

25   is, I will approve release on the condition that a certain

K2LPBOMB

1    number of sureties execute a bond in a certain amount and post

2    security in a certain amount, and then it devolves to the

3    government, in effect, to certify whether the sureties have

4    moral suasion.  That doesn't sound like that happened.

5              MR. SWETT:  That did not happen.  It was a denial of

6    the application for bail.  He was detained for risk of

7    non-appearance.

8              THE COURT:  All right.  Go on.

9              MR. SWETT:  Basically, he was transferred to the

10   Southern District of New York.  So the indictment basically

11   relates to --

12             THE COURT:  Sorry, may I ask you just one question

13   before we get to that?  Any intelligence as to why it took

14   almost seven months for the defendant to be arrested on the

15   indictment?

16             MR. SWETT:  The defendant lives in Mexico, your Honor.

17   The arrest warrant was lodged, and he traveled to the United

18   States, I believe for tourism, and was arrested when he came to

19   the United States.

20             THE COURT:  I see.  Thank you.

21             MR. SWETT:  So the indictment generally relates to a

22   large-scale money laundering network involving narcotics

23   proceeds.  This was a network that relied on the black market

24   peso exchange, and the Court likely is familiar with this, but

25   I'll just give a very brief summary of what the black market

K2LPBOMB

1   peso exchange is.

2           So rather than directly moving dirty money, the cash

3   that's picked up for a drug trafficking organization, basically

4   brokers situated in the United States and elsewhere will buy

5   and sell currency on sort of black market, and they will move

6   that currency outside the purview of the banking system and

7   outside the purview of any government.

8           So to give a very simple example.  Let's say that

9   there's an individual in Mexico who wants to send pesos to the

10  United States to avoid paying taxes, or whatever reason.  They

11  will contact a black market peso exchange broker.  That broker

12  will then buy the pesos at a discount and have to pay that

13  individual in dollars in the United States.

14          At the same time, that broker is buying dollars and

15  the black market peso exchange is fueled by the narcotics

16  industry.  So they will usually buy drug proceeds in the United

17  States at a discount, and they will need to pay the drug

18  trafficking organization in pesos in Mexico.  And so

19  essentially, by buying pesos in Mexico and buying dollars in

20  the United States, they can satisfy both of their clients, and

21  they take a commission on those transactions.

22          THE COURT:  And I take it that avoids the need for

23  physical, cold, hard cash to cross the border?

24          MR. SWETT:  Correct, your Honor.  So the indictment

25  alleges that -- or we allege that Mr. Bomba operated two

K2LPBOMB

1   companies that were part of this black market peso exchange.

2   These companies were located in the United States.  They

3   received dollars from drug trafficking organizations, and then

4   transferred those pesos to the drug trafficking organizations

5   in Mexico.  The dollars were transferred to wealthy Mexicans

6   who had bank accounts here in the United States.

7           This was a long investigation, encompassing multiple

8   years.  The time period in which we were tracking the company's

9   tie to Mr. Bomba was between approximately 2018, January 2018,

10  and January 2019.  The overall amount of dollars received into

11  those accounts for that 18-month period was approximately $20

12  million.

13          There's -- I was speaking with the agent last night,

14  who was traveling, so there's an additional account that he

15  couldn't access.  It's probably, at most, a couple of million

16  dollars extra; so we're talking about $20 million.  But that's

17  a piece of a much larger case.

18          And I'll just tell the Court sort of what are some

19  statistics related to this case.  So the government has seized

20  approximately $135 million in cash and assets, 14 firearms --

21          THE COURT:  Sorry, slow down.  135 million in cash and

22  assets.  Go ahead.

23          MR. SWETT:  14 firearms.

24          THE COURT:  Right.

25          MR. SWETT:  201 kilograms of heroin, 253 kilograms of

K2LPBOMB

1   fentanyl, 245 kilograms of cocaine, and 101 kilograms of

2   methamphetamine.  And to put that in context, this case is a

3   money laundering investigation.  It's actually not a narcotics

4   investigation, strictly speaking, but by passing leads

5   generated through this case to other agents around the country,

6   these are some of the statistics that have resulted.  The cash

7   seizures relate directly to this case.

8          THE COURT:  Tell me about Mr. Bomba's conduct

9   specifically.

10         MR. SWETT:  So Mr. Bomba's conduct specifically, as I

11  said, relates to these bank accounts.  The fact is that they

12  were opened for the purpose of transmitting dollars to -- dirty

13  dollars to Mexico in pesos and pesos to the United States.  The

14  evidence against him is the movement of the funds in and out of

15  the account.

16         We've sort of looked into these two companies.  They

17  have no footprint.  They have no ostensible business purpose

18  and, yet, they move millions of dollars.  They move millions of

19  dollars, much of which we can directly tie to drug trafficking.

20         In fact, this was a case involving what is known as an

21  Attorney General Exempt Operation, or an AGEO.  That's an

22  operation in which the DEA has limited authority to move dirty

23  proceeds, basically to track it in order to develop evidence in

24  money laundering cases.

25         So here, some of the money that was going into his

K2LPBOMB

1    accounts was money that undercovers or cooperating sources

2    picked up from drug traffickers, then put into DEA undercover

3    accounts, and then wired directly to Mr. Bomba's accounts.

4            Now, Mr. Bomba did not open these accounts himself,

5    and we would say that that's indicative of an intent to conceal

6    and his sort of consciousness of guilt, but more specifically,

7    there are cooperating sources in this case.  There is a

8    recorded call in which they discuss the fact that these are

9    narcotics proceeds.  There are encrypted messages that have

10   been recovered in the course of this investigation.

11           THE COURT:  Sorry, just to be clear, in these

12   communications with Mr. Bomba?

13           MR. SWETT:  Yes.  The recorded call is with Mr. Bomba.

14   The encrypted conversations that were consensually obtained are

15   also with Mr. Bomba, and then we have an e-mail account that we

16   believe was used by Mr. Bomba to -- there's no sort of

17   substance in the messages, but basically they send wire

18   confirmations to and from each other.

19           And it's actually, you know, you can sort of see,

20   really, the life cycle of one of these transactions by looking

21   at the messages and the accounts, where someone will

22   communicate over an encrypted app.  They will request a

23   transfer of a certain amount.  The person that they communicate

24   with will then communicate with the next person, who says this

25   is what I have, this is the commission, and so on and so forth.

K2LPBOMB

1          So we believe that the strength of the evidence is

2    quite strong here.  And, obviously --

3          THE COURT:  But you're saying there are recorded

4    conversations that -- in which Mr. Bomba participates in which

5    it is either express or thinly veiled code language that makes

6    clear that the proceeds here relate to narcotics?

7          MR. SWETT:  Yes.  I'm paraphrasing, but essentially

8    the counterparty in the conversation says:  I need to use your

9    account; it's for the narcos again, or something like that, and

10   Bomba acknowledges it.

11         So we feel we have a very strong case, and just sort

12   of to put a bow on the overall case and how it relates to risk

13   of flight.  Taking sort of the narrowest view of what his

14   guidelines exposure is, and that would be roughly $20 million

15   in laundered funds, I came out with a guidelines level of 31,

16   and that's with reference to section 2B1.1, and with certain

17   enhancements because of the money laundering offense.  And so

18   guideline level 31, and that's including acceptance points,

19   with a criminal history category of I, results in a sentence of

20   108 to 135 months.  So this is a serious crime with serious

21   consequences, which again --

22         THE COURT:  Refresh my memory, is the money laundering

23   guideline, does it revert to 2B1.1.

24         MR. SWETT:  So the way it works out is there are sort

25   of two -- there are two different prongs.  If the underlying --

K2LPBOMB

1      if the defendant committed the underlying offense, the

2      specified unlawful act, or if the underlying offense can be

3      determined, then you use the offense level for the underlying

4      offense.

5              So here, that would likely be life, if we're talking

6      about the drug seizures that are sort of tied to this case.

7      But then, in the alternative, the way it works is it's base

8      offense level eight, plus the amount of funds moved as set

9      forth in the schedule for 2B1.1, which is the fraud section.

10     So here, the range would be 9.5 million to 25 million.  And

11     then --

12             THE COURT:  Why?  I thought you said -- right, 20

13     million, very good.

14             MR. SWETT:  Right.  And that's, again, just limiting

15     it to his accounts.  That's not taking the broad view of what

16     the total is for the conspiracy.  And then there is a

17     four-level enhancement if the individual was in the business of

18     money laundering, and we think we can show that.  And then we

19     would also seek a two-level enhancement for sophisticated

20     means, which is certainly the case in this case.

21             THE COURT:  I think what you're saying is the

22     guideline approach you've taken is, in a sense, a conservative

23     one because it's anchored not in the narcotic guidelines, but

24     in the non-narcotics, money laundering guideline, correct?

25             MR. SWETT:  Correct, and even there, limiting it to

K2LPBOMB

1      funds that went through his companies.

2             THE COURT:  Okay.  Final question, then I'll turn the

3      floor to Mr. Del Valle, and we'll focus specifically on bail.

4             Does the evidence you've obtained in the case reveal

5      anything about the ultimate destination of the money, or the

6      access that Mr. Bomba has to the money that presumably the

7      business you are describing made from this and/or any other

8      work?

9             MR. SWETT:  So the answer is that we can't sort of

10     know for certain.  I will say, you know, our impression -- so

11     the 20 million that moved through his account, it's not as if

12     he made 20 million.

13            THE COURT:  Right.

14            MR. SWETT:  The amount that he personally made is a

15     bit of a guesswork.

16            THE COURT:  But you said there's, for example, a

17     discount to reflect presumably risk in the nature of the

18     business.  Are you able to figure out the haircut between the

19     American dollars that go in and the pesos that come out?

20            MR. SWETT:  So it's usually about 4 to 7 percent,

21     and -- but I would note that, you know, we've only

22     identified -- we've identified three bank accounts.  There may

23     be other bank accounts that he's using, and we know, for

24     instance, that money that he sort of -- well, we know that

25     there are accounts located in Hong Kong, accounts located in

K2LPBOMB

1    other jurisdictions, where we don't have as much clarity.  The

2    U.S. bank accounts are easy for us to look into.  Other

3    accounts located in other jurisdictions are harder for us to --

4              THE COURT:  Do you know whether this business engaged

5    in drug money laundering other than between U.S. and Mexico?

6              MR. SWETT:  Yes.  We know that they sent money to Hong

7    Kong.  It's not clear if that money was for drug trafficking

8    organizations located in Hong Kong, or the purpose was to add

9    another layer of concealment before it went back to Mexico.

10             THE COURT:  Okay.  But in terms of thinking about the

11   revenue, if that's the right way to put it, for the business,

12   your investigation spanned a 12-month period.  There is about a

13   4 to 7 percent hold or haircut on about $20 million, 7 percent

14   of $20 million would be 1.4 million, 4 percent would be

15   $800,000.  That's a ballpark revenue estimate based on the

16   revenues that you've been able to trace, without prejudice

17   to -- or rather, with respect to the money in and out that

18   you've been able to trace.  That's without prejudice to the

19   argument that there may be other accounts in the U.S. or other

20   arms of the business that aren't implicated in the 20 million

21   that you've traced.

22             MR. SWETT:  Correct, your Honor.

23             THE COURT:  All right.  Thank you, Mr. Swett.

24   Extremely helpful.

25             All right.  Mr. Del Valle, the floor is yours.

K2LPBOMB

1          MR. DEL VALLE:  Thank you, your Honor.  Good morning.

2          THE COURT:  Good morning.

3          MR. DEL VALLE:  First, I'd like to, with the Court's

4     permission, acknowledge the members of Mr. Bomba's family who

5     are here present on his behalf.  I have Mr. Bomba's mother, who

6     is present.  I have Mr. Bomba's father, who is also present,

7     Mr. Bomba's sister-in-law.

8          THE COURT:  I'm sorry, his mother's sister-in-law or

9     Mr. Bomba's sister-in-law?

10          MR. DEL VALLE:  Mr. Bomba's sister-in-law, and

11     Mr. Bomba's brother-in-law, who are also present, and a rabbi,

12     who is also here in support of Mr. Bomba.

13          THE COURT:  All right.  Let me just pause and welcome

14     all of you and thank you all for being here today.  Go ahead.

15          MR. DEL VALLE:  So, your Honor, Mr. Bomba indeed does

16     live in Mexico.  Mr. Bomba was born in Argentina, and he lives

17     in Mexico and was raised in Mexico.  And Mr. Bomba is very

18     active in the Jewish community in Mexico and, actually,

19     worldwide.

20          Mr. Bomba, your Honor, was indeed arrested on

21     January 13th of this year, when he was in California, where he

22     has often gone back and forth, and where he has relations with

23     other members of the Jewish community there.  As a matter of

24     fact, very soon I will lay out that one of the proposed

25     suretors is a member of the Jewish community there and is also

K2LPBOMB

1    a rabbi in San Diego.

2              Now, our position, your Honor, is that we're aware

3    that these are very serious charges.  We also are aware of the

4    fact that there are multiple, multiple players in this

5    conspiracy.  Mr. Bomba wasn't fleeing or hiding or didn't even

6    know.  Obviously, this all came as a surprise to him.  In fact,

7    the family was very clear with me that had they known, they

8    would have had Mr. Bomba present himself to the United States

9    authorities immediately.  I say this because also when

10   Mr. Bomba was first arrested --

11             THE COURT:  You're saying that if Mr. Bomba had known

12   that there was a sealed charge against him in the United

13   States, the family would have told him to go to the United

14   States --

15             MR. DEL VALLE:  Absolutely.

16             THE COURT:  -- to be arrested?

17             MR. DEL VALLE:  Yes, your Honor, absolutely.  And the

18   reason I say that, your Honor, is the way I was contacted was

19   by Mr. Bomba's brother-in-law, who is an attorney and also Dean

20   of a law school in Mexico.  His wife was also a lawyer, very

21   renowned in that community and, actually, are in charge of

22   giving courses to the Mexican judges.  It's a very respectful

23   family, highly respected in the area, and in the legal field.

24             Our proposal, your Honor, is noting, of course and we

25   know the Court is well aware, this is not a case where it's

K2LPBOMB

1    subject to mandatory sentencing, but our proposal, your Honor,

2    is a $750,000 personal recognizance bond, and we would proffer

3    to have this bond secured by four financially responsible

4    people, and the fifth by moral suasion; that being his mother,

5    and I'll explain.

6          Mr. Bomba's mother has come to the United States, has

7    rented an apartment in Brooklyn, has -- I provided the

8    government with a lease of that apartment.  She has pledged to

9    stay here for the length of the case, for as long as it takes,

10   living with her son in that apartment.  Those arrangements were

11   made, your Honor, because, quite frankly, he doesn't live here.

12   If your Honor does give him bail, where is he going to stay?

13   And they did that, and it's a great sacrifice.

14         Mr. Bomba's father cannot stay, but he did fly up for

15   this.  But Mr. Bomba's mother does wish to stay with him, and

16   so though she doesn't earn an income in the United States, we

17   would propose that she sign as, if you will, a third-party

18   custodian and on the basis of moral suasion with respect to the

19   bond.

20         THE COURT:  Sorry, just explain to me.  So she would

21   be the fifth cosigner?

22         MR. DEL VALLE:  She would be the fifth cosigner.

23         THE COURT:  And you're saying while she doesn't earn

24   an income, implicitly, she must have assets so that a loss of

25   $750,000 would cost her something?

K2LPBOMB

1          MR. DEL VALLE:  Yes, and she does have assets.

2     Unfortunately, they're all in Mexico, but she does have assets.

3     And the family, in a way, was vetted in order to get this

4     apartment, and it's not easy getting an apartment in Brooklyn

5     these days, and she managed to do that.

6          One of the suretors, your Honor, that we propose --

7     and by the way, just for the record, the mother's name is

8     Emiliana Chayo, C-h-a-y-o, Maria Emiliana Chayo.

9          THE COURT:  Thank you.

10         MR. DEL VALLE:  One of the financially responsible

11    people which we would submit, your Honor, is Rabbi Polichenco,

12    P-o-l-i-c-h-e-n-c-o.  This is the gentleman that lives in

13    San Diego, California.  Mr. Polichenco has also offered to put

14    his home, his personal home, as security.  We have provided the

15    government with a survey of the value of the home, as well as a

16    copy of documentation to show what the equity of this home is.

17    The home has a market value of 1,000 -- I'm sorry, one million

18    and change, and the home owes, on loans, 400,000; so it

19    actually has a value of $600,000 in equity right now.

20         THE COURT:  And you're saying that the Rabbi

21    Polichenco would put up, in effect, his equity in the home?

22         MR. DEL VALLE:  That is correct.  He's willing to put

23    up the deed, with confession of judgment, with respect to the

24    equity of that home payable, of course, to the United States

25    government and --

K2LPBOMB

1          THE COURT:  Do we know whether the mortgage company or

2     whoever holds the other interest is going to consent to this

3     arrangement?

4          MR. DEL VALLE:  Yes.  Yes, your Honor.  I did check

5     with them, and I have that information as well.  I checked with

6     First Republic Bank, and when I spoke to their legal

7     department, they said they would not have a problem with that.

8     In addition, your Honor --

9          THE COURT:  They presumably get the first money off

10    the top if the government, in effect, seizes the home; the

11    mortgage company gets the first $400,000, and the government

12    then gets the rest?

13         MR. DEL VALLE:  That's correct, your Honor.

14         THE COURT:  If any.  I mean, obviously, it depends on

15    what a fire sale of a home like that yields, but I take the

16    point that even some -- the relevant point is that while the

17    government would not necessarily be getting the full 750,000

18    that way, Rabbi Polichenco would be losing his home and,

19    therefore, there's a significant consequence to him.

20         MR. DEL VALLE:  It is.  It's very significant when

21    anybody to place where his children and his wife and he live,

22    and his wife, your Honor, would be the second cosigner.

23         THE COURT:  What is her name?

24         MR. DEL VALLE:  Her name is -- I have to spell it.

25    I'm sorry, your Honor.  Nechama, N-e-c-h-a-m-a, middle name,

K2LPBOMB

1    Dina, D-i-n-a.

2              THE COURT:  Right.

3              MR. DEL VALLE:  Polichenco.  And the reason why she

4    would be the second one is because her name is on the deed as

5    well.  It's husband and wife.

6              THE COURT:  And do the Polichencos have other means to

7    satisfy the $750,000 personal recognizance bond, other than

8    their 600 equity in the house?

9              MR. DEL VALLE:  They do, your Honor.  They have quite

10   substantial means, and I believe, in my estimate, that their

11   combined income is over $400,000 a year.

12             THE COURT:  Okay.  Go ahead.

13             MR. DEL VALLE:  Thank you.  The next proposed suretor,

14   your Honor, is Mr. Ezra Erani, E-z-r-a, last name, Erani,

15   E-r-a-n-i.  Mr. Ezra Erani, your Honor, is -- oh, by the way,

16   all these proposed suretors, for the record, are United States

17   citizens.

18             THE COURT:  Sorry, the mother is --

19             MR. DEL VALLE:  Oh, I'm sorry, except the one for

20   moral suasion, which is the mother.

21             THE COURT:  The mother is not a U.S. citizen?

22             MR. DEL VALLE:  That's right.

23             THE COURT:  But the Rabbi Polichenco and his wife are

24   and so is Mr. Erani?

25             MR. DEL VALLE:  That is correct, your Honor.  Thank

K2LPBOMB

1   you.  Thanks for that correction.

2          So Mr. Erani, your Honor, is willing to sign.  He also

3   lives here in New York City, and he's willing to put up a bank

4   account, which he's had for many, many years, with $150,000 in

5   cash.

6          THE COURT:  Meaning, he would freeze that account, in

7   effect, and not allow anything to be taken out?

8          MR. DEL VALLE:  That is correct, your Honor.

9          THE COURT:  How does he know the defendant?

10          MR. DEL VALLE:  He knows the defendant's family, your

11   Honor.  He doesn't know the defendant, and I should go back to

12   Rabbi Polichenco, who does know the defendant for over 20

13   years, but Mr. Erani does not know the defendant.  He knows the

14   family.  He knows the defendant's family.

15          I would like to point out at this time that this is a

16   very closely knit Jewish community and they, the rabbis, all

17   participate in various activities where the families

18   participate together, and there is a large community that

19   interacts with the Mexican Jewish community in Brooklyn, and

20   through those means, they know each other.

21          THE COURT:  Who in the defendant's family does

22   Mr. Erani know?

23          MR. DEL VALLE:  Mr. Erani knows the sister-in-law and

24   the brother-in-law --

25          THE COURT:  Okay.

K2LPBOMB

1          MR. DEL VALLE:  -- of Mr. Bomba.

2          THE COURT:  And there's a fourth suretor.

3          MR. DEL VALLE:  Yes, there is.  The fourth suretor,

4     your Honor, is Mr. Abraham Lichtenstein,

5     L-i-c-h-t-e-n-s-t-e-i-n.  Mr. Lichtenstein, your Honor, also

6     lives here in New York City.  He has a house in Brooklyn -- I

7     should say an apartment.  I'm sorry, an apartment in Brooklyn,

8     and Mr. Lichtenstein has indicated to me that he has a bank

9     account that he's had for a very long period of time with

10    $75,000, which he's willing to freeze, or if that's the word,

11    or put up as security.

12         THE COURT:  How does he know the defendant, Mr. Bomba?

13         MR. DEL VALLE:  Through the sister-in-law and

14    brother-in-law also.

15         THE COURT:  Has he met Mr. Bomba, or is he really

16    being vouched through the sister-in-law or brother-in-law?

17         MR. DEL VALLE:  He's being vouched, your Honor.

18         THE COURT:  He doesn't know the defendant?

19         MR. DEL VALLE:  He does not know the defendant, no.

20         THE COURT:  May I ask you just briefly, with respect

21    to the last two people who have never met the defendant --

22         MR. DEL VALLE:  Yes, sir.

23         THE COURT:  -- are they here today, these suretors?

24         MR. DEL VALLE:  No, your Honor, but they are --

25         THE COURT:  So they've literally never met the

K2LPBOMB

1    defendant?

2              MR. DEL VALLE:  They've never met.

3              THE COURT:  Look, here's the question.  The inquiry as

4    to a suretor includes not just the risk of loss but the moral

5    suasion, and the inquiry is really would the defendant, if

6    thinking of fleeing, be held back by the consequences that

7    would be visited on the suretor.  Why is the answer to that

8    question yes as to the two people he's never met?

9              MR. DEL VALLE:  Because they know the family.  They

10   know the defendant's moral character through the family.  They

11   also, your Honor, have indicated that they are part of a

12   religious organization of which the defendant is a member of,

13   and they have told me -- I've spoken to these people

14   personally -- that they consider the defendant a son and a

15   brother.

16             THE COURT:  But they've never met him.

17             MR. DEL VALLE:  But they've never met him, no, your

18   Honor.

19             THE COURT:  What does it mean to consider somebody --

20   don't take this the wrong way.

21             MR. DEL VALLE:  I understand.

22             THE COURT:  But that's an idiom.  It's a metaphor, but

23   what does it mean if you've never met the person?

24             MR. DEL VALLE:  I understand that, your Honor, and I

25   also questioned myself as to their willingness to do this, and

K2LPBOMB

```
 1   it impressed me that someone would take an account of their
 2   savings --
 3              THE COURT:  There's no question that it speaks a lot
 4   about the suretors.
 5              MR. DEL VALLE:  Right.
 6              THE COURT:  The relevant question for me is what it
 7   says about the defendant.
 8              MR. DEL VALLE:  Well, one of them told -- I asked, and
 9   they told -- why are you doing this?  He says:  Well, look, I
10   know the family.  I know this man would not defraud the family.
11   His family name, and I know this man would come to court each
12   and every time that he was required to do so.
13              THE COURT:  Do the suretors know the nature of the
14   charges?
15              MR. DEL VALLE:  Yes.  I did -- as a matter of fact,
16   your Honor, I took a further step and I sent them each a copy
17   of the entire indictment.
18              THE COURT:  Okay.
19              MR. DEL VALLE:  And I have spoken to two attorneys of
20   these two suretors.
21              THE COURT:  All right.  Mr. Del Valle, and I take it,
22   apart from the suretors and the -- we've got four suretors, who
23   are each signing the bond and then putting up, in the case of
24   the first two, a jointly held home --
25              MR. DEL VALLE:  Right.
```

K2LPBOMB

1      THE COURT:  -- on the West Coast and then for the

2  other two bank accounts in New York City.  The other terms of

3  the bail package --

4      MR. DEL VALLE:  I do have other terms.

5      THE COURT:  Yes, I just want to make sure we get to

6  Mr. Swett.  Just briefly rattle them off.  I've looked at the

7  pretrial report, and I'm assuming that a number of these are

8  familiar ones --

9      MR. DEL VALLE:  Yes.

10     THE COURT:  -- involving things like travel documents.

11     MR. DEL VALLE:  Yes.

12     THE COURT:  But so that I have a full set of your

13  package, let me know.

14     MR. DEL VALLE:  Yes, your Honor.  So we would propose

15  an electronic monitoring device with a GPS tracker be

16  installed, and that the defendant be subject to home detention

17  at that Brooklyn residence with his mother.  Obviously, travel

18  restricted within the Southern District and Eastern Districts

19  of New York.  Also, the surrender of all his travel documents,

20  and supervision by U.S. pretrial services.

21     THE COURT:  Is this a presumption case?

22     MR. DEL VALLE:  It is not.

23     THE COURT:  So the burden as to risk of flight and

24  danger to the community resides with the government.

25     MR. DEL VALLE:  That is correct, your Honor.

K2LPBOMB

1          THE COURT:  What is the status of the defendant's

2     company?

3          MR. DEL VALLE:  May I?

4          THE COURT:  Yes.

5          (Counsel and defendant conferred)

6          MR. DEL VALLE:  The companies are closed, your Honor.

7          THE COURT:  Okay.  Anything else, Mr. Del Valle?

8          MR. DEL VALLE:  Not at this time.  Thank you, your

9     Honor.

10         THE COURT:  Mr. Swett, I'm happy to hear from you.

11         MR. SWETT:  Sure.  I'll just be brief, your Honor.  So

12    first, we're not seeking detention based on danger to the

13    community.

14         THE COURT:  That's because your view is that the

15    company is closed or what?

16         MR. SWETT:  Yes, and I mean, this isn't a violence

17    case.

18         THE COURT:  Right.

19         MR. SWETT:  He hasn't committed violence, and we don't

20    think we can meet the standard of clear and convincing

21    evidence.

22         THE COURT:  I appreciate the candor.

23         MR. SWETT:  But we do think we meet the standard for

24    risk of flight.  The defendant has no ties to the United

25    States, let alone the Southern District of New York.  I think

K2LPBOMB

1    it's telling that his cosigners, most of them have never met

2    him personally.

3             THE COURT:  Is that right?  I think two of them -- the

4    mother, obviously, has.  The Rabbi -- let me ask Mr. Del Valle.

5             As to the rabbi and his wife?

6             MR. DEL VALLE:  They saw him grow up, your Honor.

7    They know him for over 20 years.

8             THE COURT:  Okay.  So two of the four, non-mother

9    cosigners, have met him?

10            MR. SWETT:  Sure.  In a situation where the U.S.

11   Attorney's Office was interviewing cosigners to determine if we

12   approved, that would be a huge red flag.  You know, all the

13   more so for a case in which the defendant has zero ties to the

14   community.  Look, it's -- I guess it's admirable that the

15   community would pull together like this, but there's something

16   very troubling about cosigners who, on someone else's say-so,

17   are willing to vouch, and as the Court pointed out, what it

18   says about the defendant's own sort of sense of responsibility

19   to stay here as which he might owe to them.

20            I also think that, you know, the lack of ties and the

21   possible outcome in this case, if he were to be convicted,

22   strongly argue in favor of detention.  He's not a U.S. citizen.

23   He's not attempting to stay in the United States.  He's not --

24   he has no family here.

25            THE COURT:  Do you know if he has children?

K2LPBOMB

1          MR. SWETT:  I don't know if he has children, but I'm

2     almost certain he has no children here in the United States.

3     And so if he were convicted, at the end of his prison sentence,

4     he would immediately be put on a plane, and he would be sent

5     back to Mexico.

6          THE COURT:  Is there a detainer on him?  Is there any

7     immigration presence here in the background?

8          MR. SWETT:  Not that I'm aware of.  He traveled here

9     on a tourist visa.

10          THE COURT:  A legitimate reason for him to be here; so

11     there would be no reason for immigration to get involved.

12          MR. SWETT:  Correct.  But the reality is that he can

13     short circuit that process by fleeing to Mexico, and I think

14     the last point I just want to make on that is he has the means,

15     and these are means both to acquire false travel documents, the

16     means to establish, you know, some sort of mode of

17     transportation that would not trigger law enforcement checks.

18          Frankly, your Honor, you know, his business, as we

19     allege, was to move money without governments or banks knowing

20     about it.  And so the reality is that this package, which is,

21     you know, a million and change, when you sort of put it all

22     together, he would have the means to make those people whole,

23     as well.  And, frankly, we don't know much about these people,

24     and they don't know much about him; so I think that's another

25     question that is raised by this package.

K2LPBOMB

1          I think, you know, electronic monitoring bracelets can

2     be cut, travel documents can be acquired.  I think there's a

3     strong incentive here.  I think, again, it's admirable that his

4     mother has relocated here, but if he's gone, she's got no

5     reason to stay here.  And, frankly, the fact that she was able

6     to relocate again speaks to the fact that this is a family that

7     has means and they have access.

8          THE COURT:  You and I had an exchange where I was

9     reasoning through the possible take from the $20 million or so

10    in a given year.  Apart from those inferences, and recognizing

11    the challenges of any international financial investigation, do

12    you have any insight into, in fact, the assets or wherewithal

13    anywhere held by the defendant or his family?

14         MR. SWETT:  Not in Mexico, your Honor.  I will say

15    that we believe some of his clients on the Mexican side, that

16    is people who are sending pesos to the United States and

17    converting them into dollars, are billionaires in Mexico.  We

18    believe that he is assisting in the movement of funds for

19    companies and individuals in Mexico that own multibillion

20    dollar companies.

21         THE COURT:  What's the basis for that representation?

22         MR. SWETT:  Because we have seized accounts to which

23    he has sent money here in the United States, and we know the

24    ownership of those accounts, and those accounts are owned by

25    individuals who we've identified through open source.

K2LPBOMB

1          THE COURT:  Is it your proposition, Mr. Swett, that

2     essentially there's no bail package that could be put together

3     that would reasonably assure the defendant's presence, or is

4     your application limited to the package that's been offered by

5     Mr. Del Valle?

6          MR. SWETT:  Well, both, but the former.  I think when

7     you have someone who has such a strong incentive to flee, such

8     little reason to remain and serious means -- I don't want to

9     say unlimited means; I mean, I don't think that's the evidence,

10    but I think he has assets, his family has assets, and I think

11    he is plugged into a community that has assets.  And, frankly,

12    that raises concerns that no matter what the package was, he

13    has that incentive and he has the ability.

14         THE COURT:  If you know -- this is not the first time

15    that the government has indicted a Mexican national with

16    respect to drugs or drug money laundering activity -- to what

17    degree had defendants in cases that have some echo of this been

18    released on conditions and to what degree have they worked?

19         MR. SWETT:  Your Honor, I did not have time to

20    research that question.  I will say, you know, just on the

21    question of what might happen if he did flee to Mexico, we have

22    an extradition treaty with Mexico, and we would certainly seek

23    his extradition.  But that treaty -- the implementation of that

24    treaty has been very difficult recently for reasons relating to

25    corruption, for reasons related to relationships between the

K2LPBOMB

1    United States and Mexico.

2            And anecdotally, it is my understanding that

3    extraditing individuals from Mexico is a long and not always a

4    feasible process at this point.  Which is, again, a concern of

5    ours, that, look, if he flees, we put a red notice on him, and

6    in some ways he's boxed in and he doesn't have the freedom to

7    live his life.  But in other ways, we have concerns that

8    getting to Mexico is a very good step for him in terms of

9    avoiding prosecution for the rest of his life.

10           THE COURT:  And is there anecdotal evidence of

11   defendants on release who have fled to Mexico, regardless of

12   the similarity or not of the charges?

13           MR. SWETT:  Oh, yes.  Absolutely, your Honor.  Look, I

14   don't have statistics, but the narcotics unit often has this

15   issue, and they sort of keep track.  And I'm happy to put in a

16   submission sort of detailing some recent examples, and I can

17   research whether there have been examples of individuals who

18   are not U.S. citizens, who were released, and let the Court

19   know what happened no those situations.

20           THE COURT:  Okay.  Anything further?

21           MR. SWETT:  No, your Honor.

22           THE COURT:  Mr. Del Valle, anything further from you?

23           MR. DEL VALLE:  Your Honor, I don't know if the Court

24   would want, but there is a rabbi here who could explain better

25   this --

K2LPBOMB

1      THE COURT:  Sorry, the rabbi who is here is not one of

2   the people who would be signing the bond?

3      MR. DEL VALLE:  No, your Honor.

4      THE COURT:  I don't think -- with respect, while I'm

5   grateful for his presence and what it says about evidently the

6   defendant's connection to the Jewish community, if he's not a

7   cosigner, it's not of relevance to me.

8      MR. DEL VALLE:  I do have the cosigner, which is the

9   sister-in-law, who is an attorney, and can maybe clarify to the

10   Court this relationship that --

11      THE COURT:  I think I'm going to pass on hearing from

12   them.  Is there anything further from you?

13      MR. DEL VALLE:  No.

14      THE COURT:  All right.  Let me take a moment.

15      MR. DEL VALLE:  Thank you, your Honor.

16      (Pause)

17      THE COURT:  All right.  I'm prepared to rule.  Under

18   Title 18, United States Code, Section 3142, the Court is to

19   make a determination whether there are conditions that can

20   reasonably guarantee the defendant's appearance for the balance

21   of this case.

22      Section 3142 also, of course, contains a separate

23   danger to the community prong.  The government has, candidly,

24   foregone making any arguments based on that prong; so my

25   remarks solely will be based on the risk of flight component of

K2LPBOMB

1    Section 3142, and there, as all agree, the burden is on the

2    government by a preponderance of the evidence to show that

3    there are not conditions that can reasonably assure the

4    defendant's continued appearance in the case before Judge Cote.

5            I have benefited today by not just the materials I've

6    read, which I recounted earlier, but the very thoughtful

7    presentations by both sides as to the issue presented.

8            Here, to begin with, the government has presented an

9    overwhelming set of arguments as to the incentives that the

10   defendant would have to flee and the reasons why he is a risk

11   of flight.  I will get, in a moment, to the package that has

12   been proposed by the defendant, but just putting that aside,

13   the government has a formidable set of arguments as to why the

14   defendant, on his own terms, presents a risk of flight, but

15   briefly, they are as follows:

16           The defendant has been charged with a gravely serious

17   offense.  Money laundering is quite a serious felony under the

18   United States Code.  It is all the more so when the offense,

19   whose proceeds are alleged to have been laundered, involves

20   narcotics, including the dangerous narcotics that were

21   described by Mr. Swett.

22           No. 2, the sentencing consequences of conviction for

23   this sort of an offense are substantial.  The sentencing

24   guidelines are, of course, no longer binding.  They're just

25   advisory, but they, nevertheless, provide, in the early stage

K2LPBOMB

of the case, some form of directional gauge as to the ballpark

in which a hypothetical sentence might be imposed, assuming the

defendant's conviction of the full scope of the charge as

previewed by the government.

And here, as proffered by Mr. Swett, the guidelines,

given the dollar volume of narcotics proceeds that it is

alleged the defendant processed, would, indeed, yield a

guideline range that, as proffered by the government, would

span the ten-year-in-prison mark, perhaps a little lower,

perhaps a little higher, but that is directionally not far off

from the ballpark of what a sentence for such an offense in

many cases would be.

Of course, when imposing sentence there would be a

much broader view of all relevant considerations, including the

defendant's background and circumstances, and there might be a

range of mitigating circumstances.  But the government's

proffer of what a guideline range, even including acceptance of

responsibility, might look like as spanning around the ten-year

in prison mark is correct, based on my considerable experience

handling cases of this nature.

Third, the government has proffered what I think can

neutrally be described as, assuming that the proffer accurate,

very potent evidence of guilt.  In particular, as proffered by

the government, there are tape recordings, as well as written

communications, texts and the like, and the tape recordings

K2LPBOMB

include an explicit reference to "narco" or the drug trade

under circumstances that, as proffered, are indicative of the

defendant's knowledge that the nature of the money being

transferred is that it is the fruits of an unlawful activity.

Significantly, the government has also proffered the

absence of evidence of some gainful reason for the defendant's

business.  It may be that, Mr. Del Valle, as the case moves

forward and you have dug into the rule 16 discovery, those

representations you may be able to challenge.  Maybe as you get

your arms around the case, there are ways of looking at

evidence, which Judge Cote would want to hear about, at least

on the government's proffer.

I've been at this business for a long time on the

bench and in practice, including as an AUSA beforehand.  I have

some sense of what strong evidence can look like.  A tape

recorded conversation or conversations with the defendant in

which overt references to the drug trade are used in connection

with the transfer of money is tough to get around.  And so

that, too, would add to the defendant's incentive to flee.

At trial, the defendant is a businessman and making a

rational business assessment of the likely outcome at trial in

the face of evidence proffered like that, he could reasonably

conclude that the government is holding a strong hand.

The defendant, in addition, there's reason to believe

he has very substantial assets.  Now, I appreciate that the

K2LPBOMB

1    government has not been in a position to trace what, in fact,

2    he has, but the colloquy I had with AUSA Swett certainly

3    suggests the likelihood of significant revenues from this line

4    of business, given the $20 million that apparently went through

5    the line of business that has been traced during a single

6    calendar year, 2018, alone.

7         On the premises that AUSA Swett offered to me, there

8    would be reason to infer that the business obtained revenue on

9    the line of business that the government is familiar with,

10   anyway, of between 800,000 and $1.4 million during the one year

11   in question, and it may well be that there are other lines of

12   business that simply haven't been traced.  The point here is,

13   though, that there are very substantial assets, and those

14   assets create opportunity and means of potentially facilitating

15   a return to Mexico.

16        Another dimension of the basis for finding that the

17   defendant -- that the government has easily met its initial

18   burden here with respect to evidence of a risk of flight are

19   the defendant's negligible ties to the United States.  In

20   practice, the only thing that would be keeping him in the

21   United States here would be the trial.

22        He was, apparently, here on either business or

23   vacation, but there's nothing that keeps him here.  And were I

24   to release him on conditions, the only thing that would be

25   keeping him here would be the upcoming trial.  There's no other

K2LPBOMB

incentive to stay.  There's nothing, in effect, offsetting an

incentive to flee.  There isn't a child here, a spouse here or

something like that.

In contrast, the defendant has deep ties overseas, to

Mexico and historically to Argentina.  Although this would be

controllable, he also has foreign passports.

And an additional and final dimension of the

government's argument as to why there would be a risk of

flight, which I credit, is the nature of the business in which

the defendant is alleged to have engaged.  By its very nature,

as proffered, it is in the concealment business, it is in the

hiding business, it's in the pretend business involving back

and forth between the United States and Mexico.

Now, I realize that moving a person from U.S. to

Mexico is a lot harder than moving cyber currency;

nevertheless, the business echoes in a way the risk of flight

here, which is to say it involves some form of concealment and

transfer between the United States and Mexico.  It is not

unreasonable, given the bad actors whom the business is alleged

to have attempted to facilitate with respect to money

laundering, that the defendant, through such people, has

connections who would be able to make the hard but not

impossible act of fleeing to Mexico without the lawful passport

easier in one way or the other.

So I find that the government has overwhelmingly

K2LPBOMB

1   advanced evidence that meets its burden here.  The question is

2   then whether or not the defense's bail package here is

3   sufficient to reasonably assure the defendant's appearance.

4   Let me be really blunt here.  I am skeptical that there is any

5   set of conditions that would reasonably assure the defendant's

6   risk of flight, essentially for all the reasons I've just

7   given.  But the overall weight of the factors I've just set out

8   makes me considerably skeptical that any package here would do

9   the trick.

10         But I have no need to reach that ultimate issue here,

11   and particularly since it is not my case, I want to rule on as

12   limited grounds as possible.  All I need to say here, without

13   regard to other hypothetical bail packages, is that I am

14   unpersuaded that this bail package, as proffered by the

15   defense, will reasonably assure the defendant's, Mr. Bomba's,

16   appearance.

17         And I say that with great appreciation, Mr. Del Valle,

18   as always for your advocacy, but particularly for the hard work

19   and vigor of your advocacy in presenting a bail package that in

20   many other cases might do the trick.  You've done a lot of work

21   to identify signatories and cosigners, and you've given a lot

22   of forethought to it.  I'm not surprised.  You've been a very

23   vigorous and effective advocate before me in many cases before

24   and in this one too.  You just have an unusually high degree of

25   difficulty here.

K2LPBOMB

1          In particular, just going through briefly the five

2     people, it is helpful that Mr. Bomba's mother has taken out an

3     apartment here.  It answers a necessary question of where he

4     would stay if he were released, but to be clear, the fact that

5     his mother has an apartment here does not in any way, shape or

6     form, make it more likely that he would stay here.  It is a

7     necessary part of the package just so that it answers that

8     Court's question of whether he'd be on the street and

9     unfindable.

10         But in the end, his mother's not being put up for

11    security, and if he were to flee to Mexico, she'd be on the

12    next plane behind him.  There's absolutely nothing about her

13    taking out an apartment here that would keep him here.  She'd

14    lose the security deposit.  That's just not a big deal.

15         Two of the four cosigners have never met the

16    defendant.  That raises a fundamental question of whether he

17    would care, or care a lot, if they took the hit of losing their

18    security or even other unsecured assets towards the amount of

19    the bond here.  But even assuming, for argument's sake, that he

20    did care about them and there was some degree of moral

21    suasion -- and, again, I'm skeptical that there can be that

22    much for people that one has never met -- if one's liberty for

23    a decade perhaps is at stake, it's not clear that the financial

24    hit that a stranger would take is going to hold them back that

25    much, even if it causes some tensions within the broader social

K2LPBOMB

1   or familial group.

2           But in any event, even to the extent there is some

3   degree of moral suasion, the combined $225,000 in equity in the

4   bank accounts seems to me would easily be made whole here,

5   based on the conversation I had with Mr. Swett, by the assumed

6   assets at the defendant's disposal.  And I think whether or not

7   that would, in fact, happen, the defendant's ability to do that

8   would perhaps allay the concern some.

9           The more substantial question is presented by the

10  rabbi and his spouse and their willingness to put up the

11  approximately $600,000 equity in the family home.  That's

12  impressive.  That speaks a lot about them and they have, in

13  fact, met the defendant more than any other part of the

14  proposed bail package that gave me a degree of pause.  In the

15  end, though, it's just not enough.  They are not family, and

16  the amount that they would stand to lose is apparently readily

17  compensable by the defendant's businesses revenue in the last

18  year alone.  There is reason to infer that the defendant could

19  repay that $600,000 with some degree of ease.

20          In the end, while it is certainly a piece of a bail

21  package, if one is viable, it's a good piece.  I would urge you

22  to stick with that if you're going to continue to work this

23  angle, Mr. Del Valle.  It simply doesn't got there or close.

24          And so with regret, because I am never happy to

25  approve the pretrial incarceration of a person who is presumed

K2LPBOMB

1    innocent, the government has met its burden, it has not been

2    rebutted, and I find that the proposed bail package is not

3    sufficient to reasonably assure the appearance of the

4    defendant.  That is not a decision about other hypothetical

5    bail packages that might be presented.  There will be time

6    enough for you to make an argument along those lines in front

7    of Judge Cote when she is back.

8              With that, is there anything further from the

9    government?

10             MR. SWETT:  No.  Thank you, your Honor.

11             THE COURT:  Anything further from the defense?

12             MR. DEL VALLE:  Nothing further.  Thank you very much,

13   your Honor.

14             THE COURT:  Thank you.  Mr. Bomba, I wish you well,

15   and I just want to thank the members of the Bomba family and

16   friends who are here.  I regret that the outcome was not what

17   you wanted, but your presence and your support for him were

18   duly noted.  I am putting it on the record so that Judge Cote

19   is aware that you were here.

20             Thank you.  We stand adjourned.

21             (Adjourned)

22

23

24

25